**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FORD RADIO & MICA CORPORATION, Respondent.**

**No. 58, Docket 24627.**

United States Court of Appeals Second Circuit.

Argued Jan. 17, 1958.

Decided Aug. 12, 1958.

---

Melvin Pollack, Attorney, National Labor Relations Board, Washington, D. C. (Jerome D. Fenton, General Counsel, Stephen Leonard, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Fannie M. Boyls, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Morton Singer, New York City (Assuero V. Carretta, New York City, on the brief), for respondent.

Before MEDINA and MOORE, Circuit Judges, and GALSTON, District Judge.

MOORE, Circuit Judge.

This is a petition by the National Labor Relations Board (referred to as "Board") for enforcement of its order against respondent Ford Radio and Mica Corporation (referred to as "Ford") to cease and desist from certain practices alleged to be violative of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1, 3) and to reinstate with back pay (now for a period of over four years) thirty-four former employees whom it discharged in early 1954.

In late January 1954, Local 365 of the UAW renewed a prior unsuccessful attempt to organize the employees of Ford, a manufacturer of mica specialties in Brooklyn, N. Y. At that time the morale of the employees was somewhat low. In late 1953 technological changes had been made resulting in a drastic cut of personnel. At the same time strenuous efforts were made to curb visiting among employees and to cut down the waste of scrap. Outside firms were doing some work formerly done at the plant and a general decline in the mica specialties industry resulted in lay-offs of substantial numbers of employees. Because of a pay scale differential between men and women employees, the women were resentful, claiming that they were receiving discriminatory treatment, and the men were fearful that the plant was being converted into an "all girl shop." To make matters worse, when business picked up in January 1954 employees were not recalled on a strictly seniority basis. Accordingly it is not surprising that the Union made substantial progress in its organizational drive and succeeded in scheduling a representation election for March 3, 1954.

The trial examiner found that Ford in conducting its campaign in February against the Union interfered with the rights of the employees to organize and bargain collectively in violation of section 8(a)(1) of the Act.[1] The findings on activities conducted prior to the election upon which the violation was based, such as, threats that the plant would be closed if the Union won, discriminatory promulgation and enforcement of a no-solicitation rule, and the making of various comments adverse to the Union are supported by substantial evidence. However, the findings as to statements and activities of the Ford management after the election on March 3 cannot be considered evidence of a violation.

By a narrow margin the Union lost the representation election, this result being known on March 11, 1954. On Friday, March 12, the Union's time for filing objections to the election expired without its taking action. Ford realized that the Board would shortly issue its certification (such certification, in fact, was forthcoming on the following Monday, March 15) and then decided to take a step which it had contemplated in February but which on the advice of counsel it had postponed until after the election, namely, to discharge "Big Joe" Zukowsky, foreman of the power press department. From the start of the drive, Zukowsky had been a zealous booster for Union representation. Despite orders from the management not to attend Union meetings and even suggestions from the Union organizer that he stay away, Zukowsky attended every Union meeting and at one introduced a speaker. There was also credible evidence that the vice-president of Ford requested Zukowsky to become a labor spy and received a curt refusal. The trial examiner, however, in a carefully reasoned analysis of the evidence concluded that the reason for discharging Zukowsky was not for his refusal to engage in this unfair labor practice but for his insistence upon actively participating in the Union drive.

On March 12, four female power press operators received smaller pay checks than they had anticipated and apparently believed that their expectations had been dashed because of their Union sympathies. At least two who complained were shown job tickets indicating shortages

---

1. All of the examiner's findings were adopted, with minor exceptions, by the Board.

in their output. The trial examiner found: (1) that the pay cuts were not discriminatory because there was no evidence that the management knew that they were Union adherents; and (2) that the pay cuts were made in accordance with a long-standing policy as to underproduction.

On the morning of Monday, March 15, about a half-hour before starting time, Zukowsky and a group of 25 to 30 women, a vast majority of whom were in his power press department, congregated across the street from the plant and began urging other workers not to enter the plant. Twenty-three of the women did not enter the plant. Attempts by the management to ascertain the nature of their grievance, if any, proved fruitless. That afternoon Ford sent telegrams to all employees participating in the walkout to report for work the next morning or be discharged. Only one returned to work and she rejoined the group on March 18. On March 16, eleven more joined the walkout and were informed by telegrams sent by Ford to report for the work the next day. None of these heeded the order. The findings by the trial examiner that the twenty-two employees who stayed out on March 15 and did not report back to work on March 16 were discharged as of that day and that the eleven who joined the walkout on March 16 were discharged on March 17 are supported by clear and convincing proof.

■ The Board's conclusion, however, that the discharges violated the Act can be sustained only by ignoring both the plain language of the statute and the requirements, uniformly applied in prior decisions, necessary to prove a violation.

Assuming *arguendo* that the trial examiner was correct in holding the walkout to be a protected activity,[2] such a finding does not *ipso facto* give rise to a violation. Regardless of whatever concerted activities the employees were engaging in, if they were discharged for any other reason, the employer does not violate the Act. Thus the motivation of the employer in ordering the discharge is the crucial element in establishing a violation.[3] The burden is upon the General Counsel for the Board to show that the employer knew the employees were engaging in protected concerted activities and that they were discharged for engaging in such activities. N. L. R. B. v. Kaiser Aluminum & Chemical Corp., 9 Cir., 1954, 217 F.2d 366. In addition the General Counsel must show in the case of a section 8(a) (3) violation as opposed to only a section 8(a) (1) violation that the discharges tended to discourage or encourage membership in a labor organization. N. L. R. B. v. J. I. Case, 8 Cir., 1952, 198 F.2d 919.

■ None of these factors were shown by the General Counsel. From this record it cannot be inferred that Ford knew the employees who had walked out were engaged in protected activity and was motivated in discharging them for engaging in any such activity. After the trial examiner devoted eleven pages of his decision to a detailed summary of the evidence relevant to the issues of whether the means and purpose of the strike were legal and whether the employees were lawfully discharged, he observed that "It is well established that violations of the Act may be found in conduct based upon a respondent's belief, true or false,

2. The trial examiner found that the walkout was not precipitated by Ford's prior unfair labor practice, but was for an objective within the scope of section 7 of the Act.

3. Many cases support this principle. Radio Officers' Union etc. v. N. L. R. B., 347 U.S. 17, 43–44, 74 S.Ct. 323, 98 L.Ed. 455; Osceola County Co-op. Creamery Ass'n v. N. L. R. B., 8 Cir., 1958, 251 F. 2d 62; N. L. R. B. v. West Point Manu-

facturing Co., 5 Cir., 1957, 245 F.2d 783; N. L. R. B. v. Shen-Valley Meat Packers, Inc., 4 Cir., 1954, 211 F.2d 289; Terry Poultry Co., 109 N.L.R.B. 1097 (1954). "An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one." N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 413.

as to the union activities of his employees." Such a rule, however, does not enable the Board to engage in speculation, unsupported by the record, as to the state of mind of the employer.

 The trial examiner concluded "that the Respondent discharged the employees listed in Appendix A on March 16, because they had, or Respondent believed they had, engaged in an economic strike on March 15; that the Respondent discharged the employees listed in Appendix B because they had, or the Respondent believed they had, joined that strike on March 16." Unlike the findings on the legality of the walkout and discharges, on this primary and crucial issue no evidence whatsoever is expressly relied upon to sustain this conclusion and the record discloses no proof adequate to support such a conclusion. This unsupported statement is all the more striking coming, as it does, after the thorough searching for the motivations of Ford in granting wage increases in February, in discharging Zukowsky, and in promulgating the no-solicitation rule. While it is unnecessary for the General Counsel to produce direct proof of the employer's actual state of mind (Radio Officers' Union v. N. L. R. B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455), facts must be such as to uphold an inference of the employer's discriminatory motivation. Here the trial examiner's own difficulty in ascertaining the legality of the purpose of the walkout undermines the conclusion that Ford was probably motivated by discrimination in discharging the employees.

The trial examiner, after conducting over two months of hearings, during which he heard some ninety witnesses whose testimony built up a record of over 5,300 pages, acknowledged that "The true purpose of the strikers is not easy to determine. * * * No formal communication immediately before or after the strike began between the Union or the employees on one hand and the Respondent on the other reveals the nature of the concessions sought." In fact, the only communication between the Union and Ford regarding the aims of the employees who had walked out occurred on March 18, after the discharges had been effected. This was an informal discussion between the plant superintendent and the Union organizer who even at that time stated that the only purpose of the picketing was to see that "these people get their jobs back." Furthermore, the record also shows beyond dispute that the dissident employees prior to discharge made no attempt whatsoever to present their grievances to the management of Ford and that the attempts by Ford to ascertain the purpose of the walkout were unsuccessful.

On the morning of March 15, when Marino, the plant superintendent, arrived at work, he went over to the group and asked what was the trouble but received no information. Later on in the morning Marino again crossed the street in an attempt to learn the reason for the walkout. He conferred with Zukowsky who told him that he had advised the women not to stay out because of his discharge and that the women would like to return but believed that they had been discharged. Thereupon Marino announced to the group that no one was fired and that "the door is open, come on in." No one accepted the invitation, the bona fides of which cannot be doubted in view of the fact that Doris Noonan returned to work the next day and was not discharged for her participation in the March 15 walkout. Shortly after Marino's meeting with Zukowsky, the dissident employees dispersed thereby eliminating any chance for the management to ascertain their grievance.

 Moreover, a short time prior to Marino's discussion with Zukowsky, a New York City police patrolman, upon instructions from Marino, approached the crowd and asked the group what was going on. According to the testimony of this disinterested witness, Zukowsky volunteered the information that the women were staying out because of his discharge. The trial examiner refused to consider this testimony because "Zukowsky was not the strikers' authorized

spokesman" and in any event Zukowsky's "supposition" as to the reason for the strike was entitled to no weight for the reason that "a witness' testimony regarding the mental processes of other persons is incompetent." Considering the fact that Zukowsky was an active member of the group and seemingly their spokesman and that the group was then and there engaged in some sort of joint activity, it is difficult to see how this evidence could be properly rejected, particularly since the statement of purpose was made in the presence of the entire group. The patrolman's testimony could not even be excluded on the ground of hearsay since Zukowsky's explanation was a spontaneous declaration accompanying the activity. Zukowsky testified that he told the patrolman that the walkout was prompted by labor conditions in the plant, but the trial examiner found it unnecessary to resolve this conflict in testimony.

■■■ Even if Zukowsky's version is accepted and it is assumed that it was not proper evidence to show the purpose of the walkout, it was still error not to consider the testimony of Taylor, the patrolman, in determining the motivation of Ford in making the discharges. Regardless of whose version was correct[4] Taylor communicated the results of his inquiry to Marino. The contents of this communication were not brought out. However, since proof of motivation of the employer was part of the General Counsel's case, his refusal to elicit this readily available and crucial testimony of a disinterested witness may well be taken to mean that the information was adverse to his case. Cf. Cullers v. Commissioner of Internal Revenue, 8 Cir., 1956, 237 F.2d 611.

From the facts in their possession on March 15 and 16, it was reasonable for Marino and the other members of the

Ford management to infer that Zukowsky's discharge was the reason for the walkout. The trial examiner's intimation that Ford was bound to regard the purpose of the walkout as a presentation of labor grievances cannot be reconciled with the admission by the General Counsel that "The discharge of Big Joe acted as a catalyst" (R. 4065). The walkout was staged on the morning of the working day immediately following Zukowsky's discharge. The overwhelming majority of those who walked out were in Zukowsky's department. The group made no attempts on their own part to inform the management of any grievances. Their silence when approached by the management on this subject could easily lead to the inference that they had no valid demands.

■■ Discharging the employees in the reasonable belief that they were protesting Zukowsky's discharge would not be a violation of either section 8(a) (1) or section 8(a) (3). The hiring, discharging and conditions of employment of supervisory personnel are strictly the prerogative of management. Concerted activity to influence the exercise of this prerogative is unprotected. Joanna Cotton Mills Co. v. N. L. R. B., 4 Cir., 1949, 176 F.2d 749. Discharges motivated by the conviction that the particular employees are interfering with this prerogative are not illegal. Therefore, regardless of the adjudication of the purpose of the strike, the General Counsel failed in discharging his burden of showing that the discharges were prompted by a motivation to discriminate or interfere with the exercise of rights guaranteed to employees under section 7 of the Act.

■■ As to the legality of the means used, a novel and even more serious question arises, namely, whether the walkout which was subsequently found by

---

4. Counsel for Ford made an offer of proof that Taylor would testify that other girls in the group also told him that Zukowsky's discharge was their reason for staying out. This offer was rejected on the ground that Taylor could not identify at the hearing the girls who made these statements. However, existence of the group and the walkout was not in dispute. Again we think that the relation of these spontaneous declarations should not have been excluded.

the Board to have been called for a lawful purpose, viz., grievances over conditions of employment, loses the protection afforded by section 7 of the Act, where those who walked out refused even to talk with the management, much less present their demands to it. If it was not a protected activity, then it is axiomatic that the employer, regardless of its motivation, may discharge the strikers and the Board is powerless to order reinstatement. E. g. N. L. R. B. v. Thayer Co., 1 Cir., 1954, 213 F.2d 748, 752.

While there are cases holding that no notice of intention to strike need be given (e. g. N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521), and other cases holding that in some circumstances a walkout without prior notice is an unprotected activity (N. L. R. B. v. Marshall Car Wheel and Foundry Co., 5 Cir., 1955, 218 F.2d 409; N. L. R. B. v. Condenser Corp. of America, 3 Cir., 1942, 128 F.2d 67), in all such cases the striking employees promptly brought their demands to the management's attention[5] or the circumstances were such that the management must have known the issues.[6] The parties here have not pointed out any cases, and independent research has disclosed none, where the management was placed in the position of having to guess at its peril the purpose behind the strike. The just solution, however, is evident from the mere statement of the proposition.

The conduct is no different, in principle, from that of a labor organization, which management recognizes as the bargaining agent for its employees, in calling a strike among the employees and then refusing to divulge the reason therefor to the employer. Undoubtedly such action would constitute a failure to bargain in violation of sections 8(b) (3) and 8(d) of the Act. Here had the dissident employees wished to present grievances concerning their conditions of employment, they did not even have to walk across the street to the plant to present them; all they had to do was to inform the plant superintendent of these grievances on either of the two occasions when he came across the street in his futile efforts to talk to them. Since they chose not to do so, they cannot now demand that this court issue a sweeping and drastic decree ordering reinstatement of thirty-four employees with back pay for approximately four years on the sole ground that their former employer was subsequently outguessed by the trial examiner in divining their true purpose in walking out.

Prior to this decision the Board has recognized that employees engaging in such high-handed tactics are not entitled to the protection of the Act. In W. L. Mead, Inc., 113 N.L.R.B. 1040 (1955), notwithstanding the fact that the collective bargaining agreement did not contain a no-strike clause, the Board held that defiance of the obligation to use the grievance and arbitration procedures therein justified the company's discharge of the striking employees. In that case the strike was held to be an unprotected activity because "The language of the Act, its declaration of policy, and its legislative history make it very clear that the bargaining duty placed upon employers and labor organizations has for its purpose the making of collective-bargaining agreements which should be

---

5. N. L. R. B. v. Cowles Publishing Co., 9 Cir., 1954, 214 F.2d 708, 710, where a group of college students whose task was to assemble Sunday newspapers walked out on 45 minutes' notice, is a case relied upon by the Board to show that "precipitate action does not render a strike unprotected," but the court emphasized that there was "no dispute that the strike was in support of *specified* demands for a raise in pay and for improved working conditions, *submitted to*

*the employer prior* to striking." (Emphasis supplied.)

6. E. g. Seyfert Foods Co., 109 N.L.R.B. 800; West Coast Casket Co., Inc., 97 N.L.R.B. 820, enforced, N. L. R. B. v. West Coast Casket Co., 9 Cir., 1953, 205 F.2d 902, both of which are also relied upon by the Board. These cases, however, involved walkouts in protest against the employers' unfair labor practices, and therefore are in no way relevant here.

binding upon the parties and employees. The Union's refusal to abide by the grievance and arbitration procedure established in the collective bargaining agreement flouted these mandates."

 The duty to bargain collectively is but a facet of the underlying purpose of the entire Act in promoting and encouraging the peaceful settlement of labor disputes. Placing the activity here under the broad protection of section 7 would clearly frustrate that purpose. To hold that those engaging in a strike had an unfettered right to refuse not only to discuss their grievances but even to name them would, far from promoting the peaceful settlement of labor disputes, inject a judicially fashioned element of chaos into the field of labor relations. "The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace." N. L. R. B. v. Draper Corp., 4 Cir., 1944, 145 F.2d 199, 202–203, 156 A.L.R. 989.

We do not hold as a matter of law that employees engaging in concerted activities must give formal or even informal notice of their purpose. However, where the employer from the facts in its possession could reasonably infer that the employees in question are engaging in unprotected activity, justice and equity require that the employees, if they chose to remain silent, bear the risk of being discharged.

 As to the sweeping cease and desist clauses of the order, it is apparent that they were framed in large measure upon the findings that the discharges of the thirty-four strikers and the activities of Ford immediately prior and subsequent to the discharges were violative of sections 8(a) (1) and 8(a) (3). Accordingly, the cease and desist clauses must be modified. While this court possesses the power to modify the order (section 10(e) of the Act), such power has generally been utilized only to delete particular paragraphs of an order and not to perform a general revision. The Board

is the proper body to fashion the appropriate remedies, and we defer to its competency. See Boeing Airplane Co. v. N. L. R. B., 9 Cir., 1954, 217 F.2d 369, 378, and cases cited therein.

Enforcement of the order as entered is denied and the cease and desist order is remanded to the Board for reconsideration in accordance with this opinion.