NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WASHINGTON ALUMINUM COM-
PANY, Inc., Respondent.

No. 8211.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1961.

Decided June 3, 1961.

Samuel M. Singer, Attorney, National Labor Relations Board, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Solomon I. Hirsh, Attorney, National Labor Relations Board, Washington, D. C., on brief), for petitioner.

Robert R. Bair, Baltimore, Md. (Venable, Baetjer & Howard, Baltimore, Md., on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This case is here on petition of the National Labor Relations Board for enforcement of two orders against the Washington Aluminum Company directing it to reinstate certain discharged employees (126 NLRB No. 162) and to bargain in good faith with a union which was chosen as the collective bargaining representative only by counting the challenged ballots cast by the discharged workers in a representation election (128 NLRB No. 79). Upon a review of the whole record in this case, for the reasons hereinafter discussed, we conclude that enforcement of both orders should be denied.

The Washington Aluminum Company is engaged in the fabrication of aluminum products at a plant in Baltimore, Maryland. As a part of its plant facilities, the company maintains a machine shop employing nine men, including a foreman and a shop leader. The machine shop is a rectangular structure with floor space measuring approximately forty by seventy-five feet. The shop contains two gas space heaters with a capacity of 85,000 B.T.U., one located in the aisle of the shop and the other at one end of the building. The opposite end of the shop is heated by an oil fired furnace with a capacity of 1,500,000 B.T.U. situated in an adjacent shop building designated as the "A" shop, which is equipped with ducts one of which carries heated air directly into the machine shop area. In November of 1958, an additional furnace with a capacity of 500,000 B.T.U. was installed in the "A" shop, and the two top rows of windows in the partition separating this shop from the machine shop were removed to allow additional heat from this new furnace to flow into the machine shop building.

Customarily on nights and weekends, these heating units are turned off when the plant is closed, not to be turned on again until 5:00 A.M. on the morning the work force is to return. However, on cold nights and weekends, the plant watchman, one Battaglia, who is charged with the responsibility of maintaining proper heating conditions in the plant during these times, is under standing orders to turn on all furnaces and heaters at such regular intervals as may be necessary to the maintenance of suitable temperatures throughout the plant.

On Monday, January 5, 1959, Battaglia turned on all the heaters and furnaces at approximately 1:00 A.M. and left them on for about one and one-half hours. At 5:00 A.M., he again started up the two gas space heaters in the machine shop and the smaller and newer of the furnaces in the "A" shop. He was unable, however, after several attempts, to put in operation the larger furnace in the "A" shop. When the machine shop foreman, one Jarvis, ar-

rived for work he found the larger furnace in the "A" shop not functioning and he and Battaglia informed the plant electrician, Rose, upon his arrival at work sometime between 7:00 and 7:15 A.M., that the furnace was for some reason mechanically inoperative. This particular furnace had ceased functioning temporarily several times since its installation although it had always been easily and quickly repaired. Rose discovered on this occasion that a control switch in the back of the furnace was in a certain position which, though it would permit the blower fans to function, would keep the electrodes from igniting the furnace fire. He immediately manipulated the control to its automatic position and the furnace shortly thereafter commenced to heat up in its normal manner. This mechanical adjustment had been made by approximately 7:30 A.M. and by the time the work whistle first sounded calling the employees to work.

The diminished heat output in the machine shop, due to the temporary functional failure of the large "A" shop furnace, was accentuated by the unusual weather conditions then prevailing in the Baltimore area. The temperature at 8:00 A.M. was but 15°, the high reading for the entire day was only 22° and the low reached 11° for an average reading of 17°, which was a minus 18° deviation from normal readings for the month. The low temperatures were ad-ditionally accentuated by the highest wind velocities recorded for the whole month.

Due to the extremely cold weather, the company president, one Rushton, had gone to the plant at ten o'clock on Sunday evening, January 4, to direct Battaglia to make certain that the plant's heaters and furnaces were turned on frequently during the night so as to insure proper working conditions when the employees came to work the following morning.

When the machine shop employees did report for work Monday morning between the approximate times of 7:10 and 7:30, they found the machine shop to be noticeably and uncomfortably cold. The condition of the shop was variously described by the employees as "cold," "colder than other days," "colder than usual," "very cold," "real cold" and "extremely cold." When the first of the workmen to arrive, one Caron, the shop leader,[1] reached the machine shop he went directly to the foreman's office. During the course of an ensuing conversation, the cold condition of the shop was mentioned and foreman Jarvis remarked to Caron, at some point after the other shop employees had arrived, that "if those fellows had any guts at all, they would go home." Although there was some question as to the import intended by Jarvis,[2] and as to the exact phrasing, there was no dispute that this statement, or one similar thereto,

Note: So that the pertinent facts and circumstances may be fairly presented, we shall resort, at least in part, to copious footnotes.

1. Caron's duties as "shop leader" were to assign the other workmen to the machines, to assist them and help plan their work schedules. He was not empowered to hire or fire, to grant permission for absence from work, or to allow a man time away from his work in the plant. These functions were vested wholly in machine shop foreman Jarvis and in higher management.

2. Jarvis testified as to the tenor of the remark as follows:

"A. Well, we—I tried to be most frank with Mr. Caron on everything that we did. I tried to have here a man that if need be could replace me in the shop, or was fully aware of what was going on. We also worked together, as I said before; and, therefore, I was under the impression that things of this nature that we had said and had been said prior to this at various times, such as if we had a bad job, why, I think—I think one specific job, I remember, we had a landing gear we were working on. Something went wrong with it. And remarks were made to the sense that 'grab your tool box and let's go, this job is all fouled up.' Something of that nature. This was more or less our relationship. I don't know how I can dress that up any more, or make it any clearer."

was in fact made. Shortly thereafter Caron went back to the machine shop work area and repeated Jarvis's remark in the presence of the other workers, none of whom had then started work. Caron thereupon told the other employees he was leaving and asked what they intended to do. He then left the machine shop alone but was closely followed by six of the other employees. Although there was an unwritten but well-known and long established company rule requiring that any employee leaving work first obtain permission from his foreman, and though the seven employees who walked out were admittedly familiar with this rule, none sought the permission of Jarvis before leaving.[3]

Immediately after his conversation with Caron and shortly before the subsequent walkout, Jarvis left the machine shop to go to the plant shipping department, returning only a "few minutes after the whistle had blown" or a little past 7:30 A.M. As he entered the shop, Jarvis saw several of the men heading toward the exit. Before he had reached the departing workmen, Jarvis passed by one Tafelmaier, another machine shop employee, and requested that Tafelmaier stay at his machine, which he did. Jarvis testified that during the time of his brief remarks to Tafelmaier the seven other men had gone out of the shop and, consequently, he had no opportunity to inquire as to their reasons for leaving or to request them also to remain.[4]

The immediate result of the walkout was to leave only Tafelmaier and Jarvis himself in the machine shop. In order to complete what general plant foreman Wampler termed "critical" jobs that were at the time being processed in the machine shop, Wampler supplied Jarvis with two temporary workers who had to be taken from their normal assignments in other departments of the plant. At approximately 8:20 A.M., company president Rushton arrived at the plant and, noticing these men and the absence of the seven regular workmen as he passed through the machine shop, asked Jarvis what had occurred. When he was told the men had walked out before starting work, he said to Jarvis, "We are going to terminate them." Rushton then called Jarvis and plant manager Tarrant to an office, discussed the situation with them and told them of the final decision to discharge all of those who had walked out. Four of the men, Adams, George, Hovis and Olshinsky, were sent telegraphic notices of dis-

3. Jarvis testified that although he had authority to grant single employees time off for part of a day, by general understanding permission for any employee to be absent from work for a period of several days, or for more than one employee to leave at the same time, except in cases of illness, would have to be granted by Wampler, the general plant foreman, or by Tarrant, the plant manager.

4. Although Jarvis testified that he heard one of the departing employees yell "[w]e are going home," he firmly denied having participated in any conversation with any employees other than Tafelmaier at the time of the walkout. Employee Caron, however, testified that as he was leaving he passed Jarvis and "might" have said, "I will see you tomorrow, I am going home," receiving the reply, "Okay, Babe, I will see you tomorrow." Employee Heinlein testified that as he departed he had asked Jarvis, "Aren't you going with us," to which Jarvis answered,

"You know I can't do that." Another employee, Adams, when asked if he had said anything to Jarvis before leaving, said, "I told him I am cold, Dave, I am sick, and I am going home."

The General Counsel affirmed at the hearing before the Trial Examiner that the Board would not contend that the employees participating in the walkout had obtained permission therefor from any source as was required by company rule.

Moreover, accepting the above remarks as having in fact been made, it should be noted that only the third referred in any manner to the heating condition in the machine shop. None of them embodied a query as to the cause or probable duration of the cold, none alluded to the cold as the specific cause of the walkout and not one contained any form of a request that the condition be either investigated or alleviated.

missal by the company personnel officer. When employee Affayroux returned to the machine shop at 9:00 o'clock that same morning from a nearby restaurant where he had gone for a cup of coffee, Jarvis personally informed him of his discharge. The remaining employees, Heinlein and Caron, were then contacted and notified by telephone.

Although there was some question as to the actual time at which a final and effective decision to terminate the men had been reached,[5] they were undeniably discharged within a short time after the walkout and before replacements had been hired. Although there was further dispute as to the company's real motivation for the discharges,[6] the Trial Examiner concluded that the employees participating in the walkout had been engaged in a "concerted refusal in the course of their employment to perform

5. Foreman Jarvis testified that when company president Rushton first arrived in the machine shop at approximately 8:30 A.M. and had noticed the absence of the regular workmen, he had said, "these people left the premises unauthorized, and I want them discharged." Jarvis further testified that he and Wampler then held a meeting with Rushton to discuss the discharges before the men were notified of their terminations. Wampler testified the decision to discharge was made between "9 and 9:30" by himself, Jarvis and Rushton. Rushton testified that when he noticed the absent men in the machine shop he stated to Jarvis, "Dave if they have all gone, we are going to terminate them," but had added, "[w]ell, before you do that now, I want a list of these people, whoever they are." Rushton further stated he first discovered the men had left without their foreman's permission at the meeting with Jarvis and Wampler and that the final decision to discharge was reached about 9:00 A.M., just before he left the plant.

6. The Trial Examiner briefly found that Rushton's testimony that "the real reason [was] because they didn't inform the foreman of the action they were taking," was "merely the statement of an afterthought." The above quoted statement of Rushton's was elicited during the following colloquy with the Trial Examiner:

"The Witness [Rushton]: Well, the real reason of course is that I was very upset at the foreman for not getting the information from those fellows, not getting the—

"Trial Examiner: Is that the reason you discharged the men, because the foreman didn't get the information?

"The Witness: The real reason is because they didn't inform the foreman of the action they were taking.

"Trial Examiner: Is that the reason you discharged them?

"The Witness: That, *plus* the disciplinary action". (Emphasis supplied.)

Jarvis testified that Rushton had stated he would discharge the men because "they had left the premises unauthorized. And this curtailed our operation. And this they were discharged for." Wampler, the general foreman, who also participated in the discharge discussions, further testified as follows:

"Q. Why did you fire these men? A. For violating plant rules, leaving the plant without permission, and to maintain discipline.

"Trial Examiner: Wait a minute. Violating plant rules and leaving the plant without permission is the same thing, isn't it?

"The Witness: Well they left without the foreman's permission.

"Trial Examiner: All right. They left without permission. And they violated the plant rule when they left without permission, didn't they? It is the same thing, isn't it?

"The Witness: Yes, I would say so.

"Trial Examiner: And to maintain discipline, you didn't fire them for that?

"The Witness: No, not for that reason.

"Trial Examiner: Then you fired them because they left the plant?

"The Witness: Correct.

"Trial Examiner: Without permission?

"The Witness: Correct."

Beyond concluding that one of Rushton's several statements was an "afterthought," the Trial Examiner held only that "by their [the employees] concerted activity * * * [they] were economic strikers * * * that by reason of their being discharged *before they were replaced,* they continued to so remain and were therefore unlawfully discharged employees * * *." The Trial Examiner made no further findings as to the company's reasons for the discharge and the Board's decision is silent on the point.

any services for Respondent [the company] in protest of certain working conditions, to wit, the failure of Respondent to supply adequate heat in their place of employment." Since the men were thus determined to have been "economic strikers," the Trial Examiner then held the discharges made before replacements were hired unlawful under section 8(a) (1) of the act, 29 U.S.C.A. § 158(a) (1), and that the employees therefore retained their employee status and were entitled to reinstatement with back pay.

The Board affirmed the Trial Examiner's report, modifying it only by adding particular emphasis to the testimony of employee Hovis to the effect that "[w]e all got together and thought it would be a good idea to go home; maybe we could get some heat brought into the plant that way;" the testimony of three of the discharged employees as to prior complaints about cold conditions in the machine shop; and the circumstance of the men leaving in a body, all at about the same time. There was one element in the intermediate report, however, not touched upon or developed by the Board in its opinion, which we believe points up the crucial factor precluding enforcement of the Board's orders in this proceeding.

■ In the text of his report, the Trial Examiner alluded only briefly to the presentation or specification of a demand or grievance by the employees by noting "the fact that they [the employees] were discharged before they had an opportunity to formally elect a committee to deal with the Respondent [the company] with respect to the adjustment of their grievance (as argued by the Respondent) is of no moment." While we do not intimate that it should ever be thought that employees not represented by a union are required to effect some sort of formal organization of a grievance committee of their fellows to submit their claims to management prior to a concerted protest of employer practices thought to be unfair, the record here before us manifests a conspicuous and total absence of any action on the part of the employees to attempt to make inquiry concerning the causes of their physical discomfort or to present their claims or demands to the company prior to the walkout.

There is little question that working conditions in the company's machine shop were less than comfortable on the morning of the walkout. The employees all testified that the shop on this morning was "cold" if not "extremely cold"; employee George testified that when he arrived at work that day he found a small icicle on one of the pipes of the water cooling system of a welding machine; employee Tafelmaier, the one worker not joining in the walkout, worked that morning until about 10:30 wearing his overcoat; foreman Jarvis testified that the shop was "a bit uncomfortable" until around 10:00 A.M. and that it was not until lunch time or shortly thereafter that the men then working in the shop removed extra coats or sweaters they had worn during the morning. In addition, Caron testified that shortly before the walkout he had observed his fellow workers "huddled" together and "shivering" in the cold.

It is apparently undisputed that the coldness was in great part attributable to inclement weather on one of the coldest days experienced during the winter of 1958–59, and that the abnormal freezing temperatures were intensified by the most severe winds of the entire month. Moreover, it is clear the company was fully aware of its responsibilities to combat these conditions for, although the plant watchman was under standing instructions as stated, the company president himself visited the plant the evening before the walkout to insure that adequate heat would be provided the employees the following morning. While the watchman was unable to fully carry out these orders, this was undeniably due to the unexpected mechanical failure of one of the plant furnaces, a condition beyond the control of the company and one quickly and effectively remedied. The plant elec-

trician attended to the matter immediately after his arrival at work, the furnace was operative by the time the men were to have started work at 7:30 A.M., it was heating to its full capacity within five to eight minutes thereafter, within twenty minutes heat from its directional ducts was being forced forty or fifty feet into the machine shop, and before lunch time this area had been heated to normal working temperature.

There was some variation in the testimony of the employees as to the real reason for the walkout.[7] But even if it be assumed their sole purpose was to protest the low temperature of their place of employment, we do not believe their actions should be considered a protected activity under the facts and circumstances here presented. One of the fundamental policies of the National Labor Relations Act, 29 U.S.C.A. § 151 (1958), is to secure industrial peace and prevent strife and disruption by encouraging negotiation and peaceful procedure for the attempted settlement of the demands of a party. That is not to say that employees may not, under any circumstances, exert concerted pressure on their employer in their efforts to gain compliance with their demands. However, the office of a demand as a condition upon the use of concerted pressures is well recognized. As this court stated in Jeffery-De Witt Insulator Co. v. N. L. R. B., 4 Cir., 1937, 91 F.2d 134, 138, 112 A. L.R. 948:

"'* * * A "strike," in such common acceptation, is the act of quitting work by a body of workmen for the purpose of coercing their employer to accede to some demand they have made upon him, and which he has refused.' "[8]

An important and necessary qualification of the right to exert pressure on an employer through work stoppages is that such pressure be exerted in support of a demand or request made to the employer.

In the instant case, none of the concerned employees made any statement before, during or subsequent to the walkout which alluded in any way to a demand that measures be taken to investigate or alleviate the cold in the machine shop.[9] Each of the employees admitted

---

7. Caron testified that just prior to leaving he turned to his fellow workers and said, "'[w]ell, Dave told me if we had any guts, we would go home,'" and "'I am going home, it is too damned cold to work'"; Heinlein testified that upon hearing this statement of Jarvis's he answered by stating, "'[i]t is all right with me, I am going home too'"; George and Olshinsky also stated they left in part because of Caron's repetition of Jarvis's remark and, additionally, because of the cold; Adams also stated he left because of the remark and, although he had not sought permission to leave, for the further reason that he had been running a fever which subsequently led him to obtain a doctor's certificate of illness; Affayroux walked out because of the cold and because he wanted to "stick" with the others; and Hovis because he had thought that "maybe we could get some heat brought into the plant that way."

8. This general principle is discussed in Restatement, Torts § 797, comment *a* (1939), as follows:

"A strike is a concerted refusal by employees to do any work for their employer * * * until the employer grants the concession *demanded.* * * * [I]t is not a strike if employees temporarily stop work without making a demand upon the employer or using the stoppage as a means of exacting a concession from him, even if the stoppage is against his will." (Emphasis supplied.)

9. Attempting to develop the theory of a long standing labor dispute, the Board cited testimony of the employees consisting of the following responses to questions as to whether they had ever complained of their working conditions: Heinlein answered, "I have frequently on occasion remarked to Mr. Rushton as he went through the building, and also to Mr. Esender [a former production manager but production co-ordinator at the time of the walkout], and I think Bill Campbell [also a former production manager employed in the estimating department when the walkout occurred]." When asked when he had so complained, Heinlein answered, "It may have been

he had made no attempt to ascertain the cause of the condition, and all testified they were unaware of the temporary failure of the larger "A" shop oil furnace and did not know it had been effectively repaired *by the time they were to have started work*. Had they made some effort to request improvement of the condition in the machine shop prior to abandoning work, it is evident from the record their efforts would have been rewarded. While the shop was undeniably cold at the time the men left, conditions in the shop gradually improved, as a result of the furnace repair, to the point where those then in the shop were working in normal comfort. Not only had the company, on its own initiative, done all that it could to relieve

the cold *before* the walkout, there is nothing in the record to indicate that a requested adjustment of the problem could not otherwise have been effected. Indeed, the refusal of the employees to seek explanation of the cause of the condition and a correction is heightened by the unquestioned privilege they all possessed, that is, to simply request the plant maintenance man to turn up the thermostats on any or all of the various heaters and furnaces the men knew to be functioning at the time of their walkout.

■ In none of the cases cited by the Board in this proceeding was there the total absence of a demand by the protesting employees as is here apparent.[10] In the instant case, without any

---

two or three times during the six months before that. Maybe a year before that. Maybe two years"; George said he had complained to "Mr. Esender and Mr. Jarvis," but amplified this by explaining that he had simply asked "why the large furnace wouldn't put out more heat"; and Caron testified, "I used to talk to Dave [Jarvis] that it was cold and miserable" but he could not recall any specific occasion when he had in fact so complained.

Conversely, foreman Jarvis testified "the complaints were in the line of general griping that you have in the lot. It is either too cold or too hot or something of that sort," and stated that he had never received a specific request for management action. Tarrant and Wampler both testified they had never heard specific complaints about the cold or received requests concerning such conditions in the shop but had only heard "conversation" about weather conditions in general. The only other member of management testifying on the point, president Rushton, described the employees' comments as "gripes" such as " 'It is cold today.' No more than we have talked about the heat last week, it has been pretty unbearable."

Accepting the prior "complaints" or "gripes" at full face value, it is notable that not one, with the exception of George's query "why the large furnace wouldn't put out more heat," was of the nature of a demand or request of the company. Moreover, as will be developed, had a question similar to George's prior inquiry been made on the

day of but before the walkout, the lack of necessity for such a disruptive protest would have been readily apparent.

10. In N. L. R. B. v. Knight Morley Corp., 6 Cir., 1957, 251 F.2d 753, the employees had complained of excessive heat through their union steward and the union president to both their foreman and management and, before walking out, they again sought permission to leave work through their union steward and president; in N. L. R. B. v. Solo Cup Co., 8 Cir., 1956, 237 F.2d 521, the employees shut down their machines and immediately demanded discussion with the plant manager concerning the discharge of a fellow worker and when informed he would soon talk with them, they resumed their work; in N. L. R. B. v. Cowles Pub. Co., 9 Cir., 1954, 214 F.2d 708, 710, the court found "there is no dispute that the strike was in support of specified demands for a raise in pay and for improved working conditions, submitted to the employer prior to striking"; in N. L. R. B. v. Southern Silk Mills, Inc., 6 Cir., 1953, 209 F.2d 155, affirmed on rehearing, 6 Cir., 1954, 210 F.2d 824, 825, the court found that "[m]anagement was advised of the reason for the stoppage and gave no satisfactory response"; in Modern Motors, Inc. v. N. L. R. B., 8 Cir., 1952, 198 F.2d 925, prior to quitting work over a disputed bonus payment, the employees discussed their grievance directly in a meeting with the company president; in Cusano v. N. L. R. B., 3 Cir., 1951, 190 F.2d 898, before leaving work to protest the discharge of a fellow worker, the employees had ne-

sort of demand on the company, the involved employees summarily left their place of employment. Under such circumstances, it would be to disregard the obligation to present a demand for peaceful settlement, and contrary to the fundamental purposes of collective bargaining, to hold the employees' unilateral action a protected concerted activity. Where certain employees had refused to enter their place of employment without first making known the reason for such refusal or requesting any concession of their employer, in N. L. R. B. v. Ford Radio & Mica Corp., 2 Cir., 1958, 258 F.2d 457, 465, the court said:

"The duty to bargain collectively is but a facet of the underlying purpose of the entire Act in promoting and encouraging the peaceful settlement of labor disputes. Placing the activity here under the broad protection of section 7 would clearly frustrate that purpose. To hold that those engaging in a strike had an unfettered right to refuse not only to discuss their grievances but even to name them would, far from promoting the peaceful settlement of labor disputes, inject a judicially fashioned element of chaos into the field of labor relations. 'The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace. * * *.'

"We do not hold as a matter of law that employees engaging in concerted activities must give formal or even informal notice of their purpose. However, where the employer from the facts in its possession could reasonably infer that the employees in question are engaging in unprotected activity, justice and equity require that the employees, if they choose to remain silent, bear the risk of being discharged."

We believe this principle particularly applicable where, as here, the cause of the objectionable condition was largely fortuitous and substantially beyond the control of the employer and was of but brief duration, and where, even beyond the neglected opportunity for inquiry, negotiation and settlement, effective measures had been taken by the employer before the protest was even staged. The company was afforded no opportunity to avoid the work stoppage by granting a concession to a demand of the employees.

▇ The National Labor Relations Act has for one of its objectives the protection of employees in freely negotiating concerning unsatisfactory plant conditions and other conditions of employment without fear of reprisal, but the purpose of the act was not to guarantee to the employees the right to do as they please under any given set of circumstances and in total disregard of the obligations of their employment. In the instant case, regular production sched-

gotiated for a consent election and had taken an open strike vote, the very knowledge of which had prompted the the employer's president to address them in a body at the plant; in N. L. R. B. v. Kennametal, Inc., 3 Cir., 1950, 182 F.2d 817, the employees stopped work and went directly to the company cafeteria where they discussed a demanded wage increase with their company president; in Gullett Gin Co. v. N. L. R. B., 5 Cir., 1950, 179 F.2d 499, the employees were discharged in the very midst of a meeting with management discussing a proposal for increased wages; in Home

Beneficial Life Ins. Co. v. N. L. R. B., 4 Cir., 1947, 159 F.2d 280, the employees' union had extensively negotiated working hour arrangements and the concerted activities were commenced only after the employer had refused to accede to the union demands and after the union had given notice of the pending concerted actions; and in Firth Carpet Co. v. N. L. R. B., 2 Cir., 1942, 129 F.2d 633, the employees left work only after they had negotiated for certain guaranteed overtime pay with the shop chairman and their foreman, and after management had refused the requested guaranty.

ules involving "critical" purchase orders were disrupted; to do the work of those who absented themselves, employees were transferred from their regular jobs in other departments and there is no evidence that any of those so substituting suffered any ill effects other than temporary discomfort. With no reasonable justification, the employees left their jobs without first having obtained the necessary permission. In a situation where several employees, unprotected against the elements, left work early with the permission of the foreman and were later discharged by higher management on the basis of the foreman's report that they had left without permission, the Board held that since the basis for the discharges was a good faith belief that permission to leave had not been obtained, the discharges could not be said to have been discriminatory or an unfair labor practice in violation of the act. Scott Lumber Co., 109 N.L.R.B. 1373 (1954). In the instant case, the company is not to be held guilty of an unfair labor practice for having discharged employees who had in fact left their jobs without permission in violation of a well known company

rule. Under these circumstances, we conclude that the discharges were not, in any sense, discriminatory and were not without justification; also, by reason of their failure to present a grievance to the company, the employees were not engaging in a protected activity since they were not acting in concert for their mutual aid or protection in withholding their services.

■ The final issue presented is the Board's finding that the company had refused to bargain in good faith with a union elected by the determinative counting of challenged ballots cast by four of the employees previously discharged for having participated in the January 5, 1959, walkout in violation of sections 8(a) (1) and 8(a) (5) of the act.[11] Having previously concluded the men casting these determinative ballots were properly discharged for cause on January 5, 1959, prior to the eligibility period for the representation election, the week ending February 2, 1959, it necessarily follows that the union's status as the certified representative of the employees, dependent as it is upon the validity of these ballots, must fail. Since the union has thus failed to carry

11. The first tally made of the March 17, 1959, consent election resulted in 68 votes in favor of the proposed union, the Industrial Union of Marine & Shipbuilding Workers of America, and 70 votes against such union with five votes challenged and one held void by the Board agent. Four of the challenged ballots were those cast by employees discharged for participating in the January 5, 1959, walkout, Affayroux, Heinlein, Hovis and Olshinsky. The Board's Regional Director later recommended the allegedly void ballot be counted as a "Yes" vote in favor of the union. The revised tally then stood at 69 votes in favor of and 70 votes opposed to the union. The Regional Director also recommended that the ballot of one Dicus, who was initially challenged as being a supervisor under the terms of the act, be counted. With the addition of the Dicus ballot, the result would then have been either 69 to 71 against union representation or would have been a tie vote. In either case, the union would not have received a majority of the ballots cast and the Board ac-

knowledges the result of the election depends on the validity of the four ballots cast by the above walkouts. The Regional Director recommended that these challenges be determined together with the unfair labor practice charges pending in respect to the voters' discharges. When the Board on March 31, 1960, held that the discharges had in fact been unfair and that the voters had thus retained the status of employees through the time of the election, all challenged ballots were tabulated resulting in a final count of 73 votes in favor of the union with 71 opposed. The union was certified on April 13, 1960, and on April 21 the company, by letter to the union, stated that "pending the outcome" of the instant proceeding, it was "not in a position to sit down with the Union and negotiate a contract." On August 16, 1960, the Board held the company's letter constituted an admission of a refusal to bargain in good faith, and further affirmed its prior decision that employees participating in the walkout had been unfairly discharged.

the representation election, the Board's order directing the company to bargain in good faith with that union will be denied enforcement, and the Board's certification of that union will be vacated and set aside. Ohio Power Co. v. N. L. R. B., 6 Cir., 1949, 176 F.2d 385, 388, 11 A.L.R.2d 243.

Enforcement denied.

SOBELOFF, Chief Judge (dissenting).

The Labor Board's position is neither unsupported by the record nor unreasonable, and I find no warrant for refusing enforcement of its order. The evidence at the hearing clearly furnishes a foundation for the Board's conclusion that the walkout of the seven employees constituted concerted activity protesting the unsatisfactory working conditions in the machine shop. Whatever notice or demand upon the employer might be required in other circumstances need not be decided, for no additional notice or demand was necessary under the well supported findings of this case.

The employer's contention that the activities of these men did not amount to concerted activity is refuted by the findings of the Examiner and the Board, based upon testimony of the employees. The Board states:

> "The Trial Examiner found, and we agree, that the Respondent violated Section 8(a) (1) in terminating the employment of the 7 complainants who were engaged in protected concerted activity under the Act. We rely, *inter alia*, upon the following: the credited testimony of employee Hovis that 'We all got together and thought it would be a good idea to go home; maybe we could get some heat brought into the plant that way;' the credited testimony of employees Heinlein, Caron and George as to previous complaints made to the Respondent's foreman over the cold working conditions, and to the effect that the men left on the morning of January 5 in protest of the coldness at the plant; and the evidence that the 7 complainants left the shop at approximately the same time."

My brethren apparently agree that if there had been a notice or demand, the walkout would be concerted activity protected by the Act. However, the court denies enforcement because, it is said, "An important and necessary qualification of the right to exert pressure on an employer through work stoppages is that such pressure be exerted in support of a demand or request made to the employer." There was, however, such notice to the employer in the instant case.[1] On a number of earlier occasions complaints had been made about the lack of heat in the shop. On the morning of the walkout, employee Caron discussed the coldness with the foreman, Jarvis. Also, as the men were walking out, they told Jarvis that it was too cold to remain and work.

Furthermore, the employer, through its foreman, indicated that the men should go home. Jarvis told Caron: "If those fellows had any guts at all, they would go home." When Caron reported back to the men, he told them that the foreman had suggested that they leave. Under these circumstances it is plainly improper to upset the Board's decision.

[1]. That notice of the reasons for concerted activity need not follow any prescribed form is clearly shown by the second of the two paragraphs quoted in the court's opinion from N. L. R. B. v. Ford Radio & Mica Corp., 2 Cir., 1958, 258 F. 2d 457, 465. There, unlike the present case, management did not precipitously fire employees. It took action only after futile attempts to learn the cause of the employees' grievance. In the instant case, by no stretch of the facts was management "placed in the position of having to guess at its peril the purpose behind the strike." Id., at page 464.